# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

GREATER OMAHA PACKING CO. )
INC., )
                              )
            Plaintiff, )
                              )   Docket no. 2:13-cv-436-GZS
v. )
                              )
FAIRBANK RECONSTRUCTION )
CORP., )
                              )
            Defendant. )

## ORDER ON MOTION TO DISMISS

Before the Court is Defendant's Motion to Dismiss (ECF No. 6).[1]  For reasons explained herein, the Court GRANTS the Motion.

## I.    STANDARD OF REVIEW

The Federal Rules of Civil Procedure require only that a complaint contain "a short and plain statement of the grounds for the court's jurisdiction ... a short and plain statement of the claim showing that the pleader is entitled to relief; and a demand for the relief sought[.]"  Fed. R. Civ. P. 8(a)(1)-(3).  The Court assumes the truth of the complaint's well-pleaded facts and draws all reasonable inferences in plaintiff's favor.  Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012). Under Rule 12(b)(6), the Court generally "may consider only facts and

---

[1] The Court notes that on June 16, 2014, GOPAC filed a nine-page "Supplemental Response Containing New Evidence In Support of Its Opposition to Fairbank's Rule 12(b)(6) Motion to Dismiss" (ECF No. 13).  This sur-reply was filed months after the Motion to Dismiss was fully briefed and without seeking leave to file a sur-reply.  The filing purports to put before the Court "new evidence" that, by all accounts, is not contained in GOPAC's Complaint.  The Court hereby ORDERS that this improperly filed document be STRICKEN from the docket.  However, the Court notes that having reviewed GOPAC's Sur-reply (ECF No. 13) and Fairbank's Response (ECF No. 14), consideration of these two documents would not change the result the Court has reached on the Motion to Dismiss.

documents that are part of or incorporated into the complaint." United Auto., Aero., Agric. Impl. Workers of Am. Int'l Union v. Fortuno, 633 F.3d 37, 39 (1st Cir. 2011) (internal citations omitted). However, the Court may "augment" the factual allegations pled in the complaint with "matters of public record and facts susceptible to judicial notice." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (citing In re Colonial Mortg. Bankers Corp., 324 F.3d 12, 15 (1st Cir. 2003); see also Giragosian v. Ryan, 547 F.3d 59, 65 (1st Cir. 2008) ("A district court may also consider 'documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice.'") (quoting In re Colonial Mortgage Bankers Corp., 324 F.3d at 20 (1st Cir.2003)).

A viable complaint generally must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007); see also Bodman v. Maine, Dept. of Health & Human Servs., 720 F. Supp. 2d 115, 121 (D. Me. 2010) (denying motion to dismiss a hostile work environment claim and explaining that "the determination of whether an issue is trialworthy simply is not the same as the determination of whether a plaintiff states a claim upon which relief can be granted"). In considering a motion to dismiss, the Court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). Plaintiffs must include enough facts supporting a claim for relief that "nudge[ ] their claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570. "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (quoting SEC v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010)); see

also Iqbal, 556 U.S. at 678 (stating that the Court need not accept "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements").

## II.    FACTUAL BACKGROUND

For the purposes of this motion, the Court considers the facts as alleged in Plaintiff's Complaint (ECF No. 1), as well as the record in consolidated cases of Long v. Fairbank Reconstruction Corp., D. Me Docket #1:09-cv-592-GZS and Smith v. Fairbank Reconstruction Corp., D. Me. Docket #2:10-cv-60-GZS (hereinafter, "Long/Smith") and the case of Jones v. Fairbank Reconstruction Corp., D. Me. Docket # 2:11-cv-437-GZS (hereinafter, "Jones").[2]

The three cases just mentioned involved three separate Maine plaintiffs who were sickened by an *E.coli* O157:H7 outbreak in the fall of 2009 (the "2009 Northeast Outbreak").  Ultimately, the illnesses of these plaintiffs and other individuals were linked to contaminated ground beef from a ground beef processing facility in Ashville, New York.  At the time, that facility was operated by Defendant Fairbank Reconstruction Corp. ("Fairbank").  Fairbank ultimately recalled approximately 500,000 pounds of ground beef linked to the 2009 Northeast Outbreak.

One of Fairbank's sources for the beef trim used to make its ground beef in 2009 was Plaintiff Greater Omaha Packing Company ("GOPAC").  GOPAC operates a beef slaughter and fabrication facility in Omaha, Nebraska, which supplies raw beef trim to ground beef processors in the United States.  In the *Long/Smith* case, Fairbank added GOPAC to the litigation as a third-party defendant.  In the later filed *Jones* case, the plaintiff named both Fairbank and GOPAC as defendants.  The allegations of GOPAC's current complaint arise out of the prior litigation in

---

[2] The Court takes judicial notice of the records in these prior cases without converting this motion to a motion for summary judgment.  See, e.g., Armour v. Monsanto Co., 2:13-CV-01408-KOB, 2014 WL 411719 at n. 1 (N.D. Ala. Feb. 3, 2014) (similarly taking judicial notice of public record in prior case).

*Long/Smith* and *Jones*.  Thus,  the Court begins its factual recitation with a brief procedural history of these cases.

**A.      Prior Litigation Involving the 2009 Northeast Outbreak**

*1.      Long/Smith*

*Long v. Fairbank Reconstruction Corp.,* D. Me. Docket # 1:09–cv–592–GZS, was filed on November 20, 2009.  *Smith v. Fairbank Reconstruction* Corp., D. Me. Docket # 2:10–cv–60–GZS, was filed on February 11, 2010.  In both cases, the plaintiffs had sued Fairbank for damages and Fairbank claimed that GOPAC was required to indemnify Fairbank for its damages under the terms of the contractual guarantee in place when it purchased beef from GOPAC.  Both cases proceeded on a similar discovery track with a number of discovery disputes brought to the attention of the Court.

During *Long/Smith* discovery, "GOPAC requested, among other items, 'all daily production and operational records, between June 1, 2009 and October 31, 2009, relating in any way to the daily production as to Establishment No. 492 [Fairbank].' (Production Requests at No. 12)."  (Compl. ¶53.) In its responses to this request, dated October 6, 2010, and signed by Attorney Shawn Stevens, acting as counsel for Fairbank, Fairbank stated the responsive records had already been provided and that it was in the process of reviewing and assembling additional documents which would be made available in Ashville, New York on October 14 and 15, 2010. (Compl. ¶54.)  Shortly after the Ashville production, Attorney Stevens "represented that 'there are only a few hundred Fairbank documents in this matter which are relevant to the recalled ground beef processed by Fairbank on the three production days in question (September 14, 15 and 16, 2009). GOPAC has had documents relating to these key production days since early August, when Fairbank provided them pursuant to its Rule 26 initial disclosures.' (Letter from Stevens to Denham of October 21, 2010)."  (Compl. ¶55.)  After Fairbank's Vice President and Chief of Food Safety, Time Biela, was deposed on or about December 2, 2010, one

of GOPAC's attorneys wrote Fairbank's attorneys seeking the production or location information of the inventory records Biela had described during his deposition, including "'[a]ll computer records regarding the Bar Code scan labels.' (Letter from Denham to Weber/Stevens of December 10, 2010)." (Compl. ¶59.)

On January 9, 2011, GOPAC counsel wrote to the Court requesting a discovery dispute conference. (Compl. ¶60.) GOPAC raised the issue of computerized records in this letter. (Id.) Specifically, GOPAC cited to the testimony of Fairbank's Tim Biela wherein he noted the existence of a scanning process relative to inventory control and finished products. Additionally, GOPAC cited the testimony of Fairbank's Don Butler who stated that Fairbank had inventory records that could be extracted from the computer system. (Compl. ¶61.) On January 17, 2011, Fairbank counsel Ralph Weber responded to GOPAC's letter and told the Court, in relevant part, that "'[a]ll of Fairbank's production records, as well as information relating to each of its suppliers, were already produced.' (Weber letter of 1-17-11)." (Compl. ¶62.) In that same letter, Attorney Weber "also represented that 'GOPAC had already received Fairbank's voluminous computer generated records'" and that "all computer generated production and tracing records have been provided." (Compl. ¶¶63 & 67.) Fairbank's counsel also represented that the facility (Fairbank) did not maintain copies of production records like weight manifests. (Compl. ¶64.)

After a hearing on the matter, the Magistrate Judge ultimately denied GOPAC's request to re-open discovery and compel production of further evidence by GOPAC on January 24, 2011. (See 1/24/11 Report of Hearing & Order (*Long* ECF No. 128).) The January 24, 2011 ruling stated in a footnote: "[T]o the extent that GOPAC contends that Fairbank appears to have failed to produce (i) inventory records that Mr. Butler testified could be extracted from Fairbank's computer system or (ii) all responsive 'weight manifests,' Fairbank represented on December 20, 2010, and reiterated in the context of the instant dispute, that any such records have been produced. GOPAC has not made a persuasive showing that this representation is inaccurate." (Id. at 9 n.1.) In explaining his decision, the

Magistrate Judge noted that the discovery deadline had expired on December 20, 2010, after several extensions and that GOPAC's counsel, while "working feverishly on this case," should have brought its remaining discovery issues to the Court's attention prior to January 9, 2011, which was the day prior to the dispositive motion deadline. (Id. at 11-12.)

Fairbank ultimately entered into settlements with both Long and Smith leaving only its indemnification claims against GOPAC for trial. Dispositive motions were filed by both Fairbank and GOPAC that queued up the legal and factual issues related to these indemnification claims. After ruling on the dispositive motions, the cases were consolidated for trial. Notably, this consolidated case became the first case involving the 2009 Northeast Outbreak to proceed to trial, although multiple other cases remained pending in other jurisdictions. By the time of the *Long/Smith* trial in November 2011, Fairbank and GOPAC both agreed that Long and Smith had suffered damages as a result of *E. coli* O157:H7 and that both women had contracted *E. coli* O157:H7 from ground beef produced by Fairbank.

At a consolidated jury trial of the claims remaining between Fairbank and GOPAC, the evidence presented showed that Smith spent $5.83 to purchase case ready 85/15 ground beef product from a Shaw's in Portland, Maine (a/k/a Shaw's Westgate) on September 23, 2009 and Long spent $2.31 to purchase case ready 85/15 ground beef product from a Shaw's in Augusta, Maine on September 19, 2009. See Jones v. Fairbank Reconstruction Corp., 2:11-CV-437-GZS, 2013 WL 6019294 (D. Me. Nov. 13, 2013). The trace-back of these two packages of beef from the respective Shaw stores to a particular production at Fairbank's Ashville plant, and in turn, to GOPAC beef trim that was produced on September 11, 2009, was hotly contested.

Fairbank presented evidence tending to show that Ms. Long and Ms. Smith, as well as all of the other 2009 Northeast Outbreak patients, consumed ground beef containing GOPAC 50-50

sirloin trim. (Compl. ¶78.) Additionally, Fairbank presented evidence tending to show that GOPAC 50-50 sirloin trim was a common denominator in the 2009 Northeast Outbreak. (Id.) Fairbank presented testimony that pointed to Invoice 30243 as an invoice that tracked to the 85/15 case-ready ground beef that Long had purchased, while Fairbank asserted that Smith had purchased 85/15 product shipped to Shaw's under Invoice 30245.[3] (Id.)

Much evidentiary presentation at the *Long/Smith* trial focused on the trace-back conducted by state and federal authorities during the fall of 2009. This investigation culminated in the USDA Food Safety and Inspection Service announced recall of Fairbank's ground beef products produced between September 14, 2009 and September 16, 2009. Fairbank introduced the "Lutz Chart," which compiled cases that government officials determined were part of the 2009 Northeast Outbreak.[4] Fairbank also presented evidence of pulsed-field gel electrophoresis (PFGE) testing and multiple loci VNTR analysis (MLVA) of cultures taken from multiple sick individuals, including Long and Smith, which showed a genetic link in the *E. coli* O157:H7 bacteria that was found in samples collected from people sickened during the outbreak. (Compl. ¶78.d.) The *Long/Smith* jury also heard evidence regarding GOPAC's "hot day" on September 11, 2009, in which their own internal testing detected the presence of *E. coli* O157:H7 in the slaughterhouse.

---

[3] This reliance on Invoices 30243 and 30245 reflected a change from initial evidence and argument that focused on Invoice 30236. (Compl. ¶¶79, 81 & 84.)

[4] The Lutz Chart was marked as part of Exhibit 131 at the *Long/Smith* trial. It is a chart made by USDA Food Safety Inspection Service investigator, Dr. Deborah Lutz. It focused on Fairbank products processed between noon on September 14, 2009 and 1:10 pm on September 16, 2009 and listed serial numbers 324432, 324433 and 324438, which were numbers that would have been assigned to GOPAC combo bins upon their arrival at the Ashville plant.

The *Long/Smith* case was ultimately submitted to the jury with a special verdict form on Fairbank's claim that GOPAC breached an express warranty contained in the Fairbank Guarantee. The jury responded "Yes" to each of the following questions:

1. Do you find that GOPAC delivered adulterated raw beef containing *E. coli* O157:H7 to Fairbank in September 2009?
2. Do you find that Fairbank acted as a reasonable buyer in using the adulterated raw beef delivered by GOPAC in September 2009?
3. Do you find that this same adulterated raw beef, which was ground by Fairbank, was later consumed by Long causing her injuries and resulting in her receipt of a settlement of $100,000?
4. Do you find that this same adulterated raw beef, which was ground by Fairbank, was later consumed by Smith causing her injuries and resulting in her receipt of a settlement of $400,000?

(See, e.g., Special Verdict Form (*Long* ECF No. 382).) The Court thereafter, on November 14, 2011, entered judgment in favor of Fairbank on its claim that GOPAC breached the express warranty on the raw beef it delivered to Fairbank. (See *Long* ECF No. 385.) Following post-trial motions, GOPAC appealed this judgment presenting multiple claims of error to the First Circuit. During that appeal process, counsel for Fairbank made multiple arguments and representations regarding the factual support for the verdict reached in *Long/Smith*. (Compl. ¶¶99-108.) Ultimately, the Court of Appeals affirmed the judgment on November 21, 2012 and issued its mandate on December 26, 2012. See generally Long v. Fairbank Reconstruction Corp., 701 F.3d 1 (1st Cir. 2012). Thereafter, this Court awarded contractual attorney's fees and expenses to Fairbank in the amount of $2,434,788.44, plus prejudgment interest. (See 3/27/14 Order on Renewed Application for Attorneys' Fees & Costs (*Long/Smith* ECF No. 437).)

   *2.     Jones*

On November 14, 2011, shortly after the verdict in the *Long/Smith* trial, Plaintiff Emmie Jones filed the case of *Jones v. Fairbank Reconstruction Corp.*, D. Me. Docket # 2:11-cv-437-

GZS. Jones alleged her child, M.J., suffered damages as a result of consuming adulterated ground beef in September 2009. Essentially, Emmie Jones claimed M.J. was a victim of the same 2009 *E. coli* O157:H7 outbreak that sickened Long and Smith. The case was initially delayed after Fairbank filed a suggestion of bankruptcy (*Jones* ECF No. 34) but resumed after the automatic stay was lifted and discovery and motion practice began in the fall of 2012. (See 9/11/12 Procedural Order (*Jones* ECF No. 56).) Like *Long/Smith*, Jones settled the claims brought on behalf of M.J. prior to trial.

As a result of discovery requests in the *Jones* case, in May 2013, Fairbank was required to produce electronic data that had not been produced during discovery in the *Long/Smith* cases. To what extent the *Long/Smith* verdict could be relied on or challenged was the subject of extensive motion practice in the *Jones* case. In relevant part, GOPAC argued that the *Long/Smith* judgment should not have any preclusive effect because the belatedly produced electronic data resulted in them not having a full and fair opportunity to litigate Fairbank's trace-back theory. See Jones v. Fairbank Reconstruction Corp., D. Me. Docket # 2:11-cv-437-GZS, 2013 WL 6019294 at *10 (D. Me. Nov. 13, 2013). The Court concluded this argument was without merit and applied collateral estoppel. See id. at *11. Ultimately, the Court precluded GOPAC from offering any evidence or argument that directly contradicted the jury's conclusion in the *Long/Smith* trial and deemed the following facts established for purposes of the *Jones* trial:

(1) The Fairbank Guarantee governed the relationship between GOPAC and Fairbank during the relevant time period;
(2) GOPAC delivered adulterated ground beef containing *E. coli* O157:H7 to Fairbank in September 2009;
(3) Fairbank acted as a reasonable buyer in using the adulterated ground beef by GOPAC in September 2009; and
(4) Long and Smith consumed this same GOPAC adulterated ground beef, after it was ground by Fairbank, causing both Long and Smith injuries and damages.

(5/8/14 Order on Fairbank's Motions in Limine (*Jones* ECF No. 204).) However, as the Court noted in its pretrial rulings, M.J.'s case presented a unique causation question because the record showed that "Emmie Jones, M.J.'s mother, purchased her family's Shaw's ground beef at a different store and on a different day from either Long or Smith." Jones, 2013 WL 6019294 at *9. Thus, the facts established by the *Long/Smith* verdict did not resolve the claim remaining in *Jones*.

In May 2014, Fairbank's remaining cross-claim against GOPAC for breach of express warranty was the subject of a jury trial. On May 15, 2014, the jury returned a special verdict form on which the jury answered "Yes" to the following question:

> Do you find that M.J.'s *E.coli* O157:H7 illness was caused by GOPAC's adulterated raw beef trim?

(See Special Verdict Form (*Jones* ECF No. 228).) Judgment was entered in accordance with the jury verdict on May 16, 2014 (*Jones* ECF No. 231). GOPAC's post-trial motions are now awaiting decision.

## B.    Factual Allegations of Current Complaint

At the time Fairbank produced the ground beef that was thereafter identified as the source of the 2009 Northeast Outbreak, it maintained electronic data in a system known as "Canopy," which captured and stored time stamped electronic data for raw material receipts, raw material usage and then finished products that were produced from those, as well as the shipping documents or the manifest related to shipping products to customers.[5]  (Compl. ¶¶28-30 & 32.)  At all times since September 2009, Fairbank retained and controlled the data in its Canopy system as it pertained to product made by Fairbank from September 14, 15 and 16, 2009.  (Compl. ¶38.)

---

[5] Canopy was set to Pacific Standard Time. Thus, to convert a Canopy time record to Eastern Standard Time, one would add three hours to the time. (Compl. ¶37.)

In September 2009, Fairbank also had a stand-alone scale. The stand-alone scale is known as the Bizerba scale. (Compl. ¶¶39 & 40.) Fairbank's stand-alone scale was a station designed to apply labels to finished products as they ran over the scale. (Compl. ¶41.) As of September 2009, Fairbank knew that it stored the time stamped data from its stand-alone scale. (Compl. ¶42.) At all times, Fairbank knew that the scale created the time stamped information for Fairbank's product case code labels with packing information noted on the labels. (Compl. ¶43.) At all times since September 2009, Fairbank retained and controlled its stand-alone scale data. (Compl. ¶50.)

A weight manifest, stored in Canopy, accompanies every Fairbank invoice and contains the serial numbers of every case of product on an invoice. (Compl. ¶44.) Armed with serial numbers from its weight manifests, Fairbank could use the stand-alone scale data to find out when serial-numbered products were packed. (Compl. ¶45.) Once Fairbank knew the pack time of a product, it could approximate the production time because product is packed within minutes of its production. (Compl. ¶46.) In addition to pack time, the stand-alone scale generated and stored production information of pack date, product type, weight and expiration dates. (Compl. ¶76.) Fairbank representatives have testified that the stand-alone scale data marks the best evidence of when a specific serial numbered product identified on a weight manifest was packed. (Compl. ¶52.)

Fairbank did not produce any Canopy data or stand-alone scale date to GOPAC until ordered to do so as part of the discovery in the *Jones* case. (Compl. ¶111.) Fairbank produced its responsive Canopy data on May 2, 2013 and its responsive stand-alone scale date on May 7, 2013. (Compl. ¶112.) Fairbank's attorneys first reviewed this data in connection with this May 2013 production. (Compl. ¶113.) Fairbank's attorneys did not use this data to prepare for their evidentiary presentation at the *Long/Smith* trial. (Compl. ¶¶93-95.) In fact, some of this data negates the trace-back narrative that Fairbank proffered during the *Long/Smith* litigation. (Compl. ¶¶114-16; 120.) By way of example, based on this electronic data, Fairbank now admits that the package of ground beef that was purchased

by Ms. Long would have been produced after 3 p.m. on September 16, 2009 and would have contained only GOPAC chuck trim.[6]  (Compl. ¶76 & 119.)   By comparison, during the *Long/Smith* litigation, Fairbank asserted that Ms. Long purchased ground beef produced between 7:46 a.m. and 1:42 p.m. on September 16, 2009 that contained GOPAC 50/50 sirloin trim.   (Compl. ¶78.)   Given the newly produced evidence, Fairbank now maintains that the source of Long's illness can be explained by cross-contamination.   (Compl. ¶118 & 125-26.)

Throughout the litigation involving the 2009 Northeast Outbreak, Fairbank has been represented by Gass Weber Mullins, LLC, a firm that has extensive litigation experience and particular experience with food safety cases.[7]   (Compl. ¶18.)   However, GOPAC now asserts that Fairbank's counsel "never asked" either Greg Fithian, Fairbank's Director of IT, or Fairbank's Tim Biela, to run searches for electronic data during the *Long/Smith* discovery or to cross-check electronic data during the process of confirming the accuracy of the evidentiary narrative it prepared and presented at the *Long/Smith* trial.   (Compl. ¶¶68-72 & 93-95.)   All told, GOPAC's Complaint alleges that Fairbank's counsel failed to comply with its discovery obligations during *Long/Smith* in the following ways:

(1) by failing to fulfill its obligation "to inquire into the existence of responsive documents that were in both hard copy and electronic form"  (Compl. ¶109.f);

(2) by failing to timely learn that "data from [Fairbank's] Canopy system and stand-alone/case code scale" as well as "data related to Fairbank's scanning process" was in the possession and control of Fairbank at all times since September 2009  (Compl. ¶109a-c, e & aa-bb);

(3) by failing to recognize that GOPAC's discovery requests "encompassed electronic/computer data related to bar code scan labels," "electronic/computer data related to production and operational records" as well as "electronic/computer data relating to the

---

[6] As noted in GOPAC's complaint, "[t]he use of chuck trim in ground round beef violates USDA regulations in that is constitutes economic adulteration." (Compl. ¶117.)

[7] Notably, GOPAC has had a change in counsel and is no longer represented by the attorneys who represented GOPAC during the *Long/Smith* discovery period.

scanning process relative to inventory control and finished products at Fairbank" (Compl. ¶109. f & x-z.)

(4) by failing to identify "data from [Fairbank's] Canopy system and stand-alone/case code scale" as relevant and responsive to GOPAC's requests (Compl. ¶¶ 73-74; 109.c & d; 140);

(5) by withholding electronic data just because Fairbank had never printed it in hard copy form; (Compl. ¶109.g);

(6) by representing as of January 17, 2010, that Fairbank had produced "[a]ll of Fairbank's production records, as well as information relating to each of its suppliers" when Fairbank had not

produced the Canopy system and stand-alone/case code scale data to GOPAC or all documents that could be generated from it (Compl. ¶109.h-j.);

(7) by representing as of January 17, 2010, that "GOPAC had already received Fairbank's voluminous computer generated records" (Compl. ¶109.l.); and

(8) by failing to have produced "inventory worksheets" and "[a]ll computer records regarding the Bar Code scan labels" as of January 17, 2010 (Compl. ¶109.k & m.)

As a result of these failures, GOPAC alleges it was unable to rebut the following during the *Long/Smith* trial:

(1) that invoice 30243 contained a link to GOPAC 50-50 sirloin trim; (Compl. ¶109.n.)

(2) that invoice 30243 contained meat that was produced between 7:46 a.m. and 1:42 p.m. on September 16, 2009 (Compl. ¶109.o.);

(3) that invoice 30243 and the Loading Plan Checklist for invoice 30243 were sufficient to trace back product (Compl. ¶109.p.);

(4) that Loading Plan Checklist for invoice 30243 reflected the times that product was staged and loaded (Compl. ¶¶109.q & 122);

(5) that the Loading Plan Checklist for invoice 30243 supported an inference that invoice 30243 contained product made between 7:46 a.m. and 1:42 p.m. on September 16, 2009 (Compl. ¶¶109.r & 123);

(6) that invoice 30243 did not contain meat that was reflected on the Lutz chart and, thus, the meat Fairbank linked to Ms. Long did not fit within the USDA investigation as reflected on the Lutz chart (Compl. ¶109.t & w; 136);

(7) that invoice 30243 did not support representations that GOPAC 50-50 sirloin trim was the common denominator among Ms. Smith, Ms. Long and the Outbreak patients (Compl. ¶109.u.);

(8) that Fairbank's experts – Harrison and Melnick – did not correctly trace GOPAC 50-50 sirloin trim to Ms. Long (Compl. ¶109.v.);

(9) the flawed trace-back analysis performed by Fairbank's and GOPAC's experts (Compl. ¶¶96;109.s; 132-34; 143);

(10) that Ms. Smith consumed meat from a 2-pound product or, as argued post-trial, that she consumed meat from a 1-pound package (Compl. ¶¶109.cc; 144); and

(11) that the BPI product used in Fairbank's ground beef production on the pertinent dates had been produced by BPI on either August 31, September 9 and September 13, 2009 and was produced by BPI under conditions that were commensurate with the *E. coli* O157:H7 interventions approved by USDA (Compl. ¶97 & 98).

Ultimately, GOPAC now alleges that Fairbank's lawyers should have known that they made multiple false representations during the *Long/Smith* litigations regarding the extent of their production and the accuracy of their trace-back narrative.[8] GOPAC asserts that these misrepresentations allow

_____

[8] To the extent that GOPAC's Complaint pleads some allegations regarding Fairbank's counsel as "knew or should have known" (see, e.g., Compl. ¶¶17, 73, 96, 104, 108, 109, 132-34, 136, 140-43), the Court finds the allegations that Fairbank "knew" to be conclusory and implausible. In multiple places, GOPAC pleads that opposing counsel "never

this Court to provide GOAC relief from the *Long/Smith* judgment and prevent prospective application of that judgment, as occurred in *Jones*.

## III. DISCUSSION

This case is an independent action brought pursuant to Federal Rule of Civil Procedure 60. Rule 60 provides the procedural mechanism by which a court may grant a party relief from judgment. Plaintiff pleads one count under Rule 60(d)(1) & (3) ("Count I"), that asks the Court to vacate the *Long/Smith* judgments and relieve GOPAC of obligations arising under the judgment; Plaintiff pleads an additional count under Rule 60(b)(5) ("Count II") that seeks to prevent any further prospective application of the *Long/Smith* judgments.[9]

The Supreme Court has previously held that the type of independent action GOPAC pleads in here is "available only to prevent a grave miscarriage of justice." United States v. Beggerly, 524 U.S. 38, 46 (1998). As a result, "[r]esort to an independent action [under Rule 60] may be had only rarely, and then only under unusual and exceptional circumstances." Wright, Miller & Kane, 11 Fed. Prac. & Proc. Civ. § 2868 (3d ed.).

> The indispensable elements of such a cause of action are (1) a judgment which ought not, in equity and good conscience, to be enforced; (2) a good defense to the alleged cause of action on which the judgment is founded; (3) fraud, accident, or mistake which prevented the defendant in the judgment from obtaining the benefit of his defense; (4) the absence of fault or negligence on the part of the defendant; and (5) the absence of any adequate remedy at law.

---

asked" (see, e.g., Compl. ¶¶93-95; 121) Fairbank representatives for information. These failure-to-ask allegations are well-pled and are at least partially based on depositions GOPAC has already taken in the *Jones* case. Thus, the Court credits the failure-to-ask allegations and disregards the irreconcilable conclusory assertions, pled in the alternative, that Fairbank's counsel somehow "knew" about the existence of data it failed to ask about or use in preparing its case.

[9] Federal Rule of Civil Procedure 60 underwent "stylistic" revision in 2007. As a result of this revision, the "savings clause" was moved from subsection (b) to subsection (d); subsection (d) now is considered the applicable subsection for independent actions seeking relief from judgment. Fed. R. Civ. P. 60, 2007 Adv. Comm. Notes; see also Mitchell v. Rees, 651 F.3d 593, 594-95 & n. 2 (6th Cir. 2011) (describing how Rule 60 now allows for independent actions), *cert. denied*, 132 S. Ct. 1111 (2012).

Id. (citing Mitchell v. Rees, 651 F.3d 593, 595 (6th Cir. 2011), *cert. denied*, 132 S. Ct. 1111 (2012)). Similarly, the First Circuit has held, "[a] party seeking relief under Rule 60(b) must demonstrate 'at a bare minimum, that his motion is timely; that exceptional circumstances exist, favoring extraordinary relief; that if the judgment is set aside, he has the right stuff to mount a potentially meritorious claim or defense; and that no unfair prejudice will accrue to the opposing parties should the motion be granted.'" Fisher v. Kadant, Inc., 589 F.3d 505, 512 (1st Cir. 2009) (*quoting* Karak v. Bursaw Oil Corp., 288 F.3d 15, 19 (1st Cir. 2002)). As the Court explains below, GOPAC's Complaint fails to plausibly plead the requisite exceptional circumstances and fails to meet other initial requirements for seeking relief by way of a Rule 60 independent action.

### A. The Complaint fails to plead a plausible claim for fraud on the court.

By invoking Rule 60(d)(3) in Count I, GOPAC alleges that the *Long/Smith* judgment was procured as a result of fraud on the court. Fraud on the court is usually found only in "egregious" cases that involve "an unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter involving an officer of the court." Roger Edwards LLC v. Fiddes & Sons Ltd., 427 F.3d 129, 133 (1st Cir. 2005) (internal citations and quotations omitted). Bribery of a judge or counsel exerting improper influence on the Court are frequently cited as examples of qualifying conduct. See id. (citing and quoting Wright, Miller & Kane, Federal Practice & Procedure: Civil 2d § 2870); see also Herring v. United States, 424 F.3d 384, 386 (3d Cir. 2005) ("Thus, fraud on the court must involve truly egregious conduct, such as bribing a judge, tampering with a jury, hiring an attorney for the purpose of influencing a judge.") However, the First Circuit has cited perjury alone as an example of conduct that would not qualify. See Roger Edwards, 427 F.3d at 133 (internal citations and quotations omitted).

The First Circuit has held that a claim alleging fraud on the court ultimately requires "clear and convincing evidence that the claimed fraud occurred." Roger Edwards, 427 F.3d at 135 (internal citations and quotations omitted). The Third Circuit has indicated that in order to meet the "necessarily demanding standard for proof of fraud on the court," the plaintiff must prove the following elements: "(1) an intentional fraud; (2) by an officer of the court; (3) which is directed at the court itself; and (4) in fact deceives the court." Herring, 424 F.3d at 386 (internal citations omitted). GOPAC's allegations do not meet this standard. Rather, at best, GOPAC has plausibly alleged that Fairbank's attorneys, in their roles as officers of this Court, were negligent in complying with discovery obligations during the *Long/Smith* litigation. As a result, Fairbank's counsel made apparent misrepresentations to this Court regarding their production of responsive materials. As alleged in the Complaint, this negligence, in turn, proximately caused Fairbank's counsel to present evidence that was incomplete and inaccurate.

Thus, the facts alleged in this case are most factually analogous to Beggerly. In that case, the Supreme Court concluded that "the most that may be charged against the Government is a failure to furnish relevant information that would at best form the basis for a Rule 60(b)(3) motion." Beggerly, 524 U.S. at 46 (1998). Likewise here, there are allegations that Fairbank "failed to thoroughly search its [electronic] records and make full disclosure" of those records during the *Long/Smith* litigation. Id. at 47. The Supreme Court has held that such failures simply do not meet the very high standard of "grave miscarriage of justice." Id.; see also, e.g., George P. Reintjes Co. v. Riley Stroker Corp., 71 F.3d 44, 49 (1st Cir. 1995) ("explaining that newly discovered evidence that "discredit[s] witnesses does not generally justify an 'extraordinary' second opportunity"); Wilson v. Johns-Manville Sales Corp., 873 F.2d 869, 872 (5th Cir. 1989) ("'[T]he mere nondisclosure to an adverse party and to the court of facts pertinent to a controversy

before the court does not add up to 'fraud upon the court' for purposes of vacating a judgment under Rule [60].'") (*quoting* <u>Kerwit Med. Prods. Inc. v. N & H Instruments, Inc.</u>, 616 F.2d 833, 837 (5th Cir. 1980)). Thus, the Court readily concludes that GOPAC cannot state a claim for fraud on the court as a matter of law.

**B.     To the extent the Complaint can be read to state a plausible independent action for misrepresentation or fraud, it is untimely.**

As the First Circuit has noted, litigants generally plead "fraud on the court" under Rule 60(d)(3) in an effort to avoid the time limitations that apply to Rule 60(b). <u>See</u> <u>Roger Edwards</u>, 427 F.3d at 133. Generally, relief under most of the subsections of Rule 60(b), including the subsection for fraud, must be sought within a "a year after entry of the judgment." Fed. R. Civ. P. 60(b)(3) & (c)(1). <u>See</u> <u>Beggerly</u>, 524 U.S. at 46 ("If relief may be obtained through an independent action in a case . . . that would at best form the basis for a Rule 60(b)(3) motion, the strict 1-year time limit on such motions would be set at naught.") As explained by the Supreme Court,

> Independent actions must, if Rule 60(b) is to be interpreted as a coherent whole, be reserved for those cases of 'injustices which, in certain instances, are deemed sufficiently gross to demand a departure' from rigid adherence to the doctrine of res judicata.

<u>Beggerly</u>, 524 U.S. at 46 (quoting <u>Hazel–Atlas Glass Co. v. Hartford–Empire Co.</u>, 322 U.S. 238, 244 (1944)).

To the extent that GOPAC's Complaint could be read to allege some form of misrepresentation or fraud, which is less than "fraud on the court" and, would therefore fall under Rule 60(b)(3), such an action is clearly time barred. (<u>See</u> GOPAC Response (ECF No. 11) at 4.) The Court likewise rejects GOPAC's suggestion that it has stated a plausible claim for relief under Rule 60(b)(2) as similarly untimely. (<u>See</u> GOPAC Response (ECF No. 11) at 4.) GOPAC argues that Rule 60(d) "permits independent actions on the bases set forth in Rule 60(b) including mistake,

inadvertence, surprise, excusable neglect, newly discovered evidence, fraud, misrepresentation or misconduct." (GOPAC Response (ECF No. 11) at 2.) GOPAC's attempt to read the time limits laid out in Rule 60(c)(1) as applying only to motions, with no application to independent actions, has been flatly rejected by the Supreme Court and the First Circuit. See Beggerly, 524 U.S. at 46; Roger Edwards, 427 F.3d at 132. Given these clear and binding precedents, the Court finds no merit in GOPAC's suggestion that its Complaint, filed on November 22, 2013, states a timely claim for relief from the *Long/Smith* judgment, which was entered on November 14, 2011.


### C. The Court concludes that the proffered electronic evidence would not change the *Long/Smith* Judgment.

Even assuming the Court could deem some of GOPAC's Rule 60 claims to be timely, the First Circuit has explained that one precondition for relief is that "the trial court [must have] reason to believe that vacating the judgment will not be an empty exercise." Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 20 (1st Cir. 1992); see also Fisher, 589 F.3d at 512 (noting ability to "mount a potentially meritorious claim or defense" as a prerequisite to relief under Rule 60(b)). On the record before this Court, the Court has no reason to believe that vacating the *Long/Smith* judgment will yield a different outcome assuming a re-trial that included all of the Fairbank electronic data that was produced in *Jones*.

As GOPAC admits, even with all of the electronic data reviewed, Fairbank maintains that Long's *E.coli* O157:H7 illness can still be traced to GOPAC trim via a "cross-contamination theory." (See Compl. ¶¶ 125 & 126.) In short, if GOPAC could establish all of the facts pled in its Complaint, the details of the Long and Smith trace-back would be somewhat different. Certainly, GOPAC would establish that the 50-50 sirloin trace-back theory presented by Fairbank's counsel at the *Long/Smith* trial is no longer supported by the newly discovered evidence

produced in the *Jones* case. GOPAC would also establish that the parameters of the initial recall were apparently under inclusive. However, the evidence of a GOPAC "hot day" on September 11, 2009 with multiple positive samples for *E.coli O157:H7* would remain unchanged. Likewise, genetic testing evidence would still provide a link between identified patients. Nothing in Fairbank's electronic data would support a finding that there was no GOPAC product in the ground beef Long or Smith consumed. In fact, the electronic data confirms that Long apparently ate ground beef with GOPAC chuck trim that was part of the September 11, 2009 "hot day" production. Keeping in mind that the preponderance of the evidence standard, the Court simply cannot see how the electronic data from Canopy and Fairbank's standalone scale would yield a reasonable jury to answer the causation questions for Long and/or Smith differently.

This conclusion is only bolstered by the results of the *Jones* trial. In that case, Fairbank's electronic data was introduced as part of the evidence for the jury to consider in determining whether the ground beef consumed by M.J. could be traced back to GOPAC. Ultimately, a different jury reached a similar conclusion finding that GOPAC was the source of the *E.coli O157:H7* contamination in ground beef consumed by M.J.[10] In short, the Court fails to see how the evidence would have "probably changed the outcome." See Roger Edwards, 427 F.3d at 134 (quoting Hoult v. Hoult, 57 F.3d 1, 6 (1st Cir. 1995)).

Viewing the allegations that form the basis of the present complaint through a different procedural lense, this Court has explained that the difference in the discovery GOPAC obtained in *Jones* as compared to *Long/Smith* reflected "hard-fought discovery battles" and the reasonable "strategic choices of GOPAC's counsel." Jones, 2013 WL 6019294 at *10 (deciding Fairbank's

---

[10] The Court acknowledges that its collateral estoppel ruling, made after having considered GOPAC's arguments regarding the newly produced electronic evidence, did foreclose GOPAC from fully re-litigating the Long/Smith causation findings.

Motion for Summary Judgment). In the Court's current assessment, this explanation remains accurate.[11] With the benefit of hindsight, it is apparent that those battles and choices resulted in *Long/Smith* trial proceeding with pieces of the evidentiary puzzle missing. However, this hindsight does not provide a basis for this Court to consider relieving GOPAC from the *Long/Smith* judgment more than a year after it was entered.

IV.     **CONCLUSION**

Therefore, Defendant's Motion to Dismiss (ECF No. 6) is GRANTED and GOPAC's Complaint is DISMISSED in its entirety. As indicated herein, GOPAC's Supplemental Response (ECF No. 13) is STRICKEN.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 23rd day of September, 2014.

---

[11] As a result, it is arguable that the electronic data GOPAC discovered in *Jones* "could . . . have been discovered through the exercise of due diligence" during the *Long/Smith* discovery period. Roger Edwards, 427 F.3d at 134.